UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SIDONIO CRUZ-SANTOS,

                    Petitioner,

          v.

JAMES ROBERTSON,

                    Respondent.

Case No. 16-cv-02447-HSG

**ORDER DENYING HABEAS PETITION; DENYING CERTIFICATE OF APPEALABILITY**

Before the Court is the *pro se* petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by petitioner Sidonio Cruz-Santos, challenging the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition, Dkt. No. 28, and Petitioner has filed a traverse, Dkt. No. 38. For the reasons set forth below, the petition is denied.[1]

## I.  PROCEDURAL HISTORY

On May 7, 2013, a Sonoma County jury found Petitioner and his codefendant, Augustin Zepeda-Onofre guilty of the second-degree murder of Gabino Lopez-Santiago (Cal. Penal Code § 187); the unlawful cultivation of marijuana (Cal. Health & Saf. Code § 11358); and three counts of assault with a firearm (Cal. Penal Code § 245(a)(2)). Petitioner was also found guilty of intimidation of a witness (Cal. Penal Code § 136.1(c)(1)). The jury also found true a number of firearm-related enhancement allegations (Cal. Penal Code §§ 12022, 12022.3, 12022.4, 12022.5). Clerk's Transcript ("CT") at 1106–1133.[2] The trial court sentenced Petitioner to a total term of 42

---

[1] In accordance with Habeas Rule 2(a) and Rule 25(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to substitute Warden James Robertson as Respondent because he is Petitioner's current custodian.

[2] The Clerk's Transcript has been filed as Exhibit 1 to the Answer.

years and 8 months to life, and sentenced Augustin to a term of 25 years to life. CT 1299–1302.

On November 18, 2015, the California Court of Appeal affirmed Petitioner's conviction. *People v. Cruz-Santos*, 2015 WL 728204 (Cal. Ct. App. 2015).

On November 30, 2015, both Petitioner and Augustin filed petitions for rehearing, which were denied by the state appellate court on December 8, 2015. Answer, Exs. 11 and 12.

Both Petitioner and Augustin filed petitions for review in the California Supreme Court and, on March 25, 2016, the California Supreme Court summarily denied review. Answer, Exs. 13 and 14. Justice Liu filed a Dissenting Statement, stating that review should be granted to: (1) determine the scope of California's natural and probable consequences doctrine in the context of murder; and (2) determine whether the trial evidence was sufficient to support the murder conviction under the NPC doctrine. Answer, Ex. 14. In response, Chief Justice Cantil-Sakauye filed a Concurring Statement, stating that (1) "reasonable minds may differ about the characterization of the record below;" and (2) "it is well established that this court's denial of a petition for review is not an expression of the court's opinion concerning the correctness of the underlying appellate decision, or its result, or of any law stated in that decision." *Id.*

On April 20, 2016, Petitioner filed the instant federal habeas petition. Dkt. No. 1.

## II. STATEMENT OF FACTS

The following factual background is taken from the November 18, 2015 opinion of the California Court of Appeal:[3]

> In October 2011, Ramon Lopez–Velasco spent several days as a casual laborer working at a location on Chemise Road outside Healdsburg. Lopez–Velasco was hired by Cruz–Santos, and worked alongside Zepeda–Onofre cultivating marijuana plants and putting marijuana in bags for transportation "to the place where they kept more marijuana." Lopez–Velasco was told by Cruz–Santos that the marijuana was "medical."
>
> Lopez–Velasco soon realized that firearms were a constant presence. Zepeda–Onofre was wearing a handgun when he first met Lopez–Velasco, and Cruz–Santos told Zepeda–Onofre to get a gun for Lopez–Velasco. Zepeda–Onofre did so, and showed Lopez–

---

[3] The Court has independently reviewed the record as required by AEDPA. *Nasby v. Daniel*, 853 F.3d 1049, 1052–54 (9th Cir. 2017). Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2014), unless otherwise indicated in this order.

Velasco how to load the weapon. Cruz–Santos told Lopez–Velasco "to carry that gun with me in case of an emergency. If something were to happen during the nighttime because ... there are wild animals and there are people whose objective is to steal the harvest." Cruz–Santos brought Lopez–Velasco to the site at night because, as Zepeda–Onofre told him, "it was better to travel at night so that nobody saw us." With Zepeda–Onofre, Lopez–Velasco stayed overnight at the site, the handgun by his side. Cruz–Santos and Zepeda–Onofre were usually armed. [FN 2.] Lopez–Velasco also saw a pair of rifles.

> FN 2: According to a neighbor who was also growing marijuana, "Ramon" was present at a conversation between the neighbor and Cruz–Santos sometime in mid-October. During the conversation, Cruz–Santos was holding a rifle, and fingering "part of a packaging with three or four bullets in it" while expressing fear of being robbed.

On Friday, Lopez–Velasco told Cruz–Santos that he (Lopez–Velasco) would be returning to his regular job on Monday. As the afternoon was ending, Cruz–Santos, Zepeda–Onofre, and Lopez–Velasco were joined at the Chemise Road site by three men—Conrado Cruz (Conrado), Gabino (who was Lopez–Velasco's brother-in-law), and a man named "Angel." [FN 3] Food, beer, and cocaine were consumed. [FN 4][4] At one point Cruz–Santos became so irritated at someone riding an all-terrain vehicle nearby that he ordered Zepeda–Onofre "to shoot the gun" "to frighten those assholes ... so that they would leave" "and stay way [sic] from the place." Zepeda–Onofre dutifully fired a single shot. Everyone was drinking. Later, angry words began to be exchanged between Conrado and Gabino. Things became so heated that Cruz–Santos drew his gun and told the pair: "If you have problems in your house then go fix them in your house. But don't come here and give me problems. Because the devil is touching me and I can be capable of anything." These words made Conrado afraid and receptive to Lopez–Velasco's urging that they should leave. Conrado and Gabino were sufficiently "drunk they [had] a difficult time walking properly." Cruz–Santos and Zepeda–Onofre were "not totally" intoxicated. Conrado was also disoriented, and had previously "lost consciousness."

> FN 3: An olive grower testified that Conrado "was a laborer who worked for me on and off for several years," and sometimes brought Gabino "if he [Conrado] needed additional assistance with the job."

> FN 4: The blood taken from Cruz–Santos and Zepeda–Onofre shortly after the murder tested positive for cocaine; Lopez–Velasco's blood did not.

Lopez–Velasco testified that Conrado started to walk away, but not toward the "only one way" to exit the site. With gun in hand, Cruz–Santos blocked his way "telling him that was the wrong way to take." But Conrado "was stubborn," saying "that that was the way he had originally come from." Cruz–Santos "kept on insisting that wasn't the way that he had originally come from." After a few minutes of this, Lopez–Velasco—who described himself as "the only person ... there in his five senses"—led the stumbling Conrado and Gabino out of what they called "the garden" and towards the driveway off the property. Cruz–Santos and Zepeda–Onofre followed them.

According to Lopez–Velasco, when the group reached the driveway, "Mr. Conrado explained to me that he was very drunk ... that he wasn't able to drive. He gave me his keys in order to go get his truck from where it had been ... parked." As Lopez–Velasco started to retrieve Conrado's truck, he heard Cruz–Santos and Zepeda–Onofre "walking towards the driveway where we were standing," and then saw them standing next to a car parked on the driveway, which was near to where Lopez–Velasco had left Conrado and Gabino. About two minutes later, Lopez–Velasco heard three or four gunshots, but he continued walking to get Conrado's truck.

Lopez–Velasco explained what then happened: "When I came back with the truck ... I was able to see that ... Mr. Sidonio [Cruz–Santos] had Conrado on the ground with the gun to his head." [¶] ... [¶] "I stopped the truck as fast as I could, and I ran towards where Mr. Sidonio was, grabbing Mr. Conrado." [¶] ... [¶] "When I was getting closer to them I could listen to what he was saying, not to say anything of what Conrado had seen, because he was capable of finding him or his family and kill them." Lopez–Velasco pushed Cruz–Santos off Conrado. Cruz–Santos "put the gun twice, one in the head and on my chest." Lopez–Velasco asked Cruz–Santos "where Gabino was." Cruz–Santos replied "Gabino had gone to hell." When Lopez–Velasco asked "why?", Cruz–Santos answered "because I want[ed] to." Spotting "a lot of blood" on the driveway, Lopez–Velasco again asked "where Gabino was," and Cruz–Santos told Zepeda–Onofre to "show [him] where Gabino was."

Zepeda–Onofre appeared with a gun in his hand—"the same gun that they were carrying that same day." [¶] ... [¶] "With his right hand he was holding the gun, and with his left hand he was indicating where he wanted me to walk to." After walking a short distance, Zepeda–Onofre told Lopez–Velasco to "look down." [¶] ... [¶] "It was Gabino's body." At this point, "Sidonio [Cruz–Santos] with weapon in hand ordered Mr. Conrado that he help me get the body out of there." Cruz–Santos actually said: "get that garbage out of there [¶] ... [¶] to tear him apart or to bury him, but he didn't want to know anything of what ... happened. And if I said something or if I whispered something, that he was going to find me here or in Mexico and my family to do the same to me. I asked him why he had done it." Cruz–Santos's response: "Just because he wanted [to do] it."

While Cruz–Santos and Zepeda–Onofre "were pointing at me with the gun," Lopez–Velasco and Conrado managed to get Gabino's body into the truck. Conrado refused to get into the truck with Lopez–Velasco, at which point, "[w]hen I realized that he didn't want to get in the truck I ran towards the driver's seat ... to get out of there as fast ... as I could." Lopez–Velasco drove for about an hour, dumped the body by the road, and then notified Healdsburg police. The version Lopez–Velasco provided to police had significant lies and omissions.

Lopez–Velasco further testified that he did not see either Conrado or Gabino with a gun that night.

Following the initial interview with Lopez–Velasco, in which he told police he thought Conrado might also be dead, officers immediately went to Conrado's home, where they found him unhurt but generally nervous. Conrado voluntarily went with the officers to a police station "to be asked more questions about why Gabino wasn't at the house." It was still night when Lopez–Velasco led other officers to the Chemise Road property, where he pointed out the bloodstain on the driveway and the "marijuana garden." According to one of the officers, Lopez–Velasco was "very nervous about going back there," and "very afraid" when on the premises showing the layout to the officers. At about 5:00 a.m., the officers met Zepeda–Onofre driving a truck down the driveway. Although it was still dark, and although he was out of sight in the back of a police vehicle, Lopez–Velasco was described as "terrified" while he identified Zepeda–Onofre (who had been taken out of the truck and was being guarded while sitting on the ground in front of the truck, but within Lopez–Velasco's line of sight). And when Cruz–Santos was apprehended in another vehicle on the premises and brought to the scene, one officer testified that "I recall him [Lopez–Velasco] trying to ... duck down and make himself not visible when Sidonio was around."

The officers then searched the site and found three bags of dried marijuana, and considerable amounts of "dried or drying marijuana." [FN 5] As the officers were walking down the driveway, Cruz–Santos's car drove up and stopped. The car was being driven by a man Lopez–Velasco did not recognize. Cruz–Santos was not in it. Blood splatter marks

were visible on the vehicle, as well as "smear marks where it looked like somebody had wiped it up." The truck driven by Zepeda–Onofre also gave proof of recent bloody use. One officer testified that "I saw dry blood in the bed portion of the pickup truck, and I also saw drag marks which looked like whatever was in the back of the truck was dragged toward the tailgate end ... of the pickup truck." Also found were a loaded rifle and ammunition of various calibers.

> FN 5: Officers subsequently searching the premises pursuant to a warrant found a hidden rifle and approximately 180 pounds of marijuana.

A prosecution expert, Detective Brandon Van Camp, testified that the cultivation on Chemise Road was an illegal, non-medicinal, commercial operation, designed to evade aerial detection. He estimated the street value of the marijuana was at least $800 per pound. When asked "What is your training and experience, if any, with regard to firearms in marijuana grows?", the expert replied: "Well, definitely of all the outdoor marijuana grows that I have been in and certainly most of the training that I've been to, there are definitely firearms are involved with outdoor marijuana gardens." There are "multiple reasons" for the connection: "One is to protect and defend the garden from intruders. Two is to protect it from wildlife" such as deer and rats.

The jury heard forensic testimony that Gabino was shot twice—once in the face and once in the chest—and that either shot would be fatal.

*Cruz-Santos*, 2015 WL 728204, at *1–*4.

# III. DISCUSSION

## A. Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the

jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). The final state court decision from the California Supreme Court summarily denied Petitioner's petition for review. The California Court of Appeal was the last reasoned state court decision that addressed the claims raised by Petitioner. Accordingly, in reviewing the habeas petition, this Court reviews the California Court of Appeal's decision. *See Ylst*, 501 U.S. at 803–04; *Barker*, 423 F.3d at 1091–92.[4]

---

[4] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default. *Barker*, 423 F.3d at 1092 n.3 (citing *Lambert v. Blodgett*, 393 F.3d 943, 970 n.17 (9th Cir. 2004), and *Bailey v. Rae*, 339 F.3d 1107, 1112–13 (9th Cir. 2003)). The look through rule is applicable here as the Ninth Circuit has held that "it is a

6

## B.     Petitioner's Claims

Petitioner alleges the following cognizable claims for habeas relief: (1) the trial court erred when instructing the jury on the natural and probable consequences theory of murder because there was insufficient evidence to support this instruction;[5] (2) the accomplice testimony was not sufficiently corroborated to sustain Petitioner's conviction; (3) the trial court erred when instructing the jury on the crime of intimidating a witness; (4) the trial court erred in excluding evidence that someone other than Petitioner was the killer; and (5) cumulative prejudice from the aforementioned claims.  *See* Dkt. No. 1 ("Pet."); Dkt. No. 16 (Order to Show Cause); and Dkt. No. 25 (Second Order to Show Cause).

### 1.     Sufficiency of the Evidence

Petitioner argues that the trial court erred when instructing the jury on the natural and probable consequences theory of murder because the evidence was insufficient to support the liability of a coconspirator or aider or abettor under the natural and probable consequences doctrine.  Pet. at 7–11 and 14–15.  The state court rejected this claim as follows:

> **The Legal Principles**
> "'Penal Code section 31, which governs aider and abettor liability, provides in relevant part, "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission ... are principals in any crime so committed." An aider and abettor is one who acts "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." [Citations.]' '[A] person who aids and abets the commission of a crime is a "principal" in the crime, and thus shares the guilt of the actual perpetrator.' [Citation.]"

common practice of the federal courts to examine the last reasoned state decision to determine whether a state-court decision is 'contrary to' or 'an unreasonable application of' clearly established federal law" and "it [is] unlikely that the Supreme Court intended to disrupt this practice without making its intention clear."  *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

[5] In the Order to Show Cause, the Court found that Petitioner stated a cognizable claim that the trial court erred when instructing the jury on the natural and probable consequences theory of murder.  Dkt. No. 16 at 2.  However, Respondent correctly points out that although the subheadings for this claim characterize the issue as instructional error, in that the jury instruction contained a permissive inference that murder could be a natural and probable consequence of the underlying crime of unlawful cultivation of marijuana, Petitioner is actually arguing that the instruction is in error because there was insufficient evidence under the natural and probable consequences theory of murder to support both the jury instruction or the murder conviction.  *See* Pet. at 14–15.  Because the alleged error in giving the jury instruction is based on Petitioner's argument that there was insufficient evidence presented to support the natural and probable consequences doctrine, the Court treats this claim solely as a sufficiency of the evidence claim.

"An aider and abettor is guilty not only of the intended, or target, crime but also of any other crime a principal in the target crime actually commits (the nontarget crime) that is a natural and probable consequence of the target crime. [Citations.] 'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.' [Citation.]"

"A consequence that is *reasonably foreseeable* is a natural and probable consequence under this doctrine. 'A nontarget offense is a "'natural and probable consequence' " of the target offense if, judged objectively, the additional offense was reasonably foreseeable. [Citation.] The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. [Citation.] Rather, liability "'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.'" [Citation.] Reasonable foreseeability "is a factual issue to be resolved by the jury." [Citations.]'" (*Smith, supra,* 60 Cal.4th at p. 611.)

But the reach of the natural and probable consequences doctrine is limited to second degree murder. "[A]n aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles." (*People v. Chiu* (2014) 59 Cal.4th 155, 158–159.) "In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing. A primary rationale for punishing such aiders and abettors—to deter them from aiding or encouraging the commission of offenses—is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder." (*Id.* at p. 165.) "[P]unishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Id.* at p. 166.)

"The statutes and, accordingly, the natural and probable consequence doctrine, do not distinguish among principals on the basis of whether they directly or indirectly aided and abetted the target crime, or whether they directly or indirectly aided and abetted the perpetrator of the nontarget crime. An aider and abettor of the target crime is guilty of any crime that any principal in that target crime commits if it was a natural and probable, i.e., reasonably foreseeable, consequence of the target crime. [¶] ... [¶] ... To establish aiding and abetting liability under the natural and probable consequence doctrine, the prosecution must prove the nontarget offense was reasonably foreseeable; it need not *additionally* prove the nontarget offense was not committed for a reason independent of the common plan to commit the target offense." (*Smith, supra,* at pp. 613–614.)

**The Instructions Given**

The jury was initially instructed with a modified version CALCRIM Nos. 417 and 402 as follows:

"A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit no matter which member of the conspiracy commits the crime. A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of a common plan or design of the conspiracy. This rule applies even if the act was not intended as part of the original plan. Under this rule, a defendant who is a member of the conspiracy does not need to be present at the time of the act.

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.

"A member of a conspiracy is not criminally responsible for the act of another member if that act does not further the common plan or is not a natural and probable consequence of the common plan.

"To prove that the defendant is guilty of a crime of murder charged in Count 1, the People must prove that the defendant conspired to commit illegal cultivation of marijuana, a member of the conspiracy committed the murder to further the conspiracy, and murder was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit."

"The defendants are charged in Count 1 with murder, in Count 3 with illegal cultivation of marijuana, and in counts 4 and 6 with assault with a firearm. It is also alleged, although not charged, that the defendants committed the crime of brandishing a firearm in violation of Penal Code Section 417(a)(1).

"You must first decide whether the defendant is guilty of illegal cultivation of marijuana, assault with a firearm or brandishing a firearm. These will be called the target offenses. If you find the defendant is guilty of any of these crimes, you must then decide whether that defendant is guilty of murder.

"Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time. To prove that the defendant is guilty of murder under this theory, the People must prove that the defendant is guilty of one of the target offenses; during the commission of the target offenses, a co-participant in that crime committed the crime of murder; and under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of murder was a natural and probable consequence of the commission of the target ... offenses he committed.

"A co-participant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander.

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.

"If the murder was committed for any reason independent of the common plan to commit the target offense or offenses, then the commission of murder was not a natural and probable consequence of those offenses. [¶] ... [¶]

"To decide whether target offenses ... were committed, please refer to the separate instructions that I will provide for those crimes."

After the jury had been deliberating for three days, the court modified CALCRIM No. 417 with the following: "[T]o prove that a defendant is guilty of the crimes of Assault with a Deadly Weapon, charged in Counts IV and VI, under a conspiracy theory, the People must prove that: 1. The defendant conspired to commit Illegal Cultivation of Marijuana; 2. A member of the conspiracy committed the Assault with a Deadly Weapon to further the conspiracy; AND 3. The Assault with a Deadly Weapon was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit.

"The defendant is not responsible for the acts of another person who was not a member of

the conspiracy even if the acts of the other person helped accomplish the goal of the conspiracy. A conspiracy member is not responsible for the acts of other conspiracy members that are done after the goal of the conspiracy has been accomplished. Conspiracy and aiding and abetting theories of culpability are to be determined separately, following instruction 417 and instruction 402 which individually define these theories." [FN 6]

> FN 6: The modification appears to have been prompted by this question from the jury: "If we decide there *was* a conspiracy to unlawfully cultivate, does the liability of coconspirators apply to the murder charge only? Or, does it apply to *all* charges that we determine are natural & probable consequences of the conspiracy?"

**The Initial Arguments**
In their initial briefing, defendants contend that the prosecution's whole reading of the case was off-kilter and misplaced. As Zepeda–Onofre terms it, the jury was given an "invalid theory of liability," namely, "murder could be a natural and probable consequence of illegal marijuana cultivation or of a conspiracy to illegally cultivate marijuana." Cruz–Santos covers the same ground from a slightly different angle: the prosecution's theory for murder was defective "because there was insufficient evidence of the necessary factual predicate, namely, that murder is a natural and probable consequence of a conspiracy to cultivate marijuana." Zepeda–Onofre joins this argument. Cruz–Santos goes on to attack the court's instructions because they "failed to instruct on the necessary element of malice."

In varying degrees, both defendants approach the issue of whether murder can be a natural and probable consequence of marijuana cultivation as something of a theoretical abstraction akin to an issue of law. [FN 7] It is not. When it has the support of substantial evidence, "the issue is a factual question to be resolved by the jury in light of all of the circumstances surrounding the incident." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531.) This is the rule for both co-conspirator and aider and abettor liability. (See, e.g., *Smith, supra,* at p. 611; *People v. Prettyman* (1996) 14 Cal.4th 248, 269; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376; *People v. Luparello* (1986) 187 Cal.App.3d 410, 442–443.)

> FN 7: And both focus on only one of the three target offenses identified in the instructions. This could be deemed an implicit concession that the two other target offenses—assault with a firearm and brandishing a firearm—identified in the instructions as target offenses—were sound. (See 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 342, p. 392, § 512, pp. 577–578.) However, we elect to address the merits of defendants' arguments.

True, our Supreme Court has repeatedly refused to accept that running a large scale drug operation necessarily entails murder. (*People v. Hinton* (2006) 37 Cal.4th 839, 880 ["Nor do we accept defendant's suggestion that murder was a natural and probable consequence of any drug deal 'involving a large sum of money.'"]; *People v. Garceau* (1993) 6 Cal.4th 140, 183 ["[t]he record clearly fails to establish, as a *matter of law,* that the killings were a 'reasonably foreseeable' consequence of the methamphetamine manufacturing operation conducted on the Rambos' property."]) This follows from the nature of the crucial inquiry: "'[T]he ultimate ... question is one of foreseeability.' [Citation.] Thus, '"[a] natural and probable consequence is a foreseeable consequence"....' [Citation.] But 'to be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough...." [Citation.]' [Citation.] A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case ... and is a factual issue to be resolved by the jury." (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).) "The precise consequence need not have been foreseen.... [¶] ... The issue is 'whether, under all of the circumstances presented, a reasonable person in the defendant's position would have *or should have*

*known* that the [shooting] was a reasonably foreseeable consequence of the act....'" (*Id.* at p. 927.) In other words, the issue is seldom one of law, almost always one of fact.

"A jury finding of reasonable foreseeability provides the crucial nexus that links a defendant's culpability for aiding and abetting the target offense to his criminal liability for the nontarget offense. Without that nexus, there is no basis—no legally sufficient theory of causation—to find the defendant culpable for the nontarget offense. Our cases have thus recognized, without exception, that 'the trier of fact must ... find that ... the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted.'" (*People v. Favor* (2012) 54 Cal.4th 868, 882.)

So, when Zepeda–Onofre argues that the trial court's instructions "were erroneous ... because a jury cannot reasonably find that a murder committed by a defendant's confederate was a natural and probable consequence of marijuana cultivation because there is not a sufficiently close connection between the target crime and commission of murder," he is rather plainly asking this court to decide, as a matter of law, that murder can never be a natural and probable consequence of cultivating marijuana.

We reject the request. A tie between gunshot death and the clandestine commercial cultivation of marijuana may not be inevitable, but the possibility of a connection has been around at least since *People v. Dillon* (1983) 34 Cal.3d 441, where the defendant was convicted of murder for killing the guard at a marijuana farm. Whether the connection between that offense is a sufficient nexus to foreseeability and liability for murder is a matter of the evidence, which is ordinarily left to the jury when there is substantial evidence. (*People v. Prettyman, supra,* 14 Cal.4th 248, 269.) And the presence of substantial evidence is to be explored with generosity to the inferences, credibility determinations, and weighing of the evidence that favor the prosecution. (*People v. Jennings, supra,* 50 Cal.4th at pp. 638–639.) This is also the governing approach when the prosecution relies on circumstantial evidence. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

To repeat, the question is not whether homicide was the most likely consequence or the most foreseeable. Nor is the issue whether murder was even a statistically strong probability. All that is needed is substantial evidence that death was "'"a possible consequence which might reasonably have been contemplated." [Citation.]'" (*Medina,* at pp. 920, 927.) That there was.

The jury could conclude from the prosecution's evidence that there was the possibility of gun violence inhered in the marijuana operation. From the testimony of Lopez–Velasco, corroborated in part by Detective Van Camp, the jury could conclude that workers commonly carried loaded firearms with the expectation that they might be needed and were expected to be used. From the incident when Zepeda–Onofre obeyed the command of Cruz–Santos to "frighten those assholes" making too much noise, the jury could further conclude that neither defendant was averse to having a gun fired at persons who caused irritation. From the incident when the drunken Cruz–Santos brandished his firearm to halt the dispute between Cruz and Lopez–Santiago, the jury could conclude that Cruz–Santos had no inhibition about threatening to use his gun to halt irritation coming from an even closer source, that is, one not coming from an intruder or thief, but emanating from within the garden itself. And from defendants' use of their guns to kill Gabino and then to coerce Lopez–Velasco and Conrado into disposing of the bodies, the jury could conclude that defendants had no compunctions about using deadly force in order to compel compliance from employees at the very place they were cultivating marijuana.

Then there is the factor of intoxicants. The jury heard evidence from which it could conclude that defendants had ingested cocaine and alcohol. It is not inevitable that near or semi-intoxication will result in death by gunshot. But when the people intoxicated are

11

more or less continually armed because they are engaged in a criminal enterprise, and when the threat of violence—particularly the use of those guns—is not treated as significant, a jury could conclude that this was a witch's brew of circumstances where a drunken disagreement could escalate.

In these circumstances, it was certainly a reasonably foreseeable consequence that death might result from either brandishing a firearm or committing an assault with it. (*Smith,* at pp. 611, 617.) And when the context of the circumstances is cultivating marijuana, it cannot be excluded from consideration. Murder need not be actually foreseen. (*Smith,* at p. 611.) It need not be the most likely outcome, or even a more likely than not probability. [FN 8] (*Medina, supra,* at p. 920.) Like our Supreme Court, we are not deciding that death is a natural and probable consequence of running a marijuana cultivation farm. We decide only that in the circumstances attending the manner in which defendants organized and operated this cultivation operation, there was substantial evidence from which the jury could conclude that death was "a possible consequence which might reasonably have been contemplated." (*Medina,* at pp. 920, 927.)

> FN 8: Our Supreme Court in *Smith* identified an additional consideration: "To be sure, whether an unintended crime was the independent product of the perpetrator's mind outside of, or foreign to, the common design may, if shown by the evidence, become *relevant* to the question whether that crime was a natural and probable consequence of the target crime. In a given case, a criminal defendant may argue to the jury that the nontarget crime was the perpetrator's independent idea unrelated to the common plan, and thus was *not* reasonably foreseeable and *not* a natural and probable consequence of the target crime." (*Smith,* at p. 617.) Defendants did not adopt this approach, possibly because neither was willing to go beyond the hypothetical and actually identify who was "the perpetrator" that killed the victim.

Cruz–Santos's attack on the instructions requires only brief comment. He contends that CALCRIM No. 417 "[w]as erroneous, because it failed to instruct the jury that it could not convict appellant of murder unless it found malice." True enough, but the trial court also instructed the jury with CALCRIM No. 520 to the effect that to convict either defendant of murder required malice and finding the natural and probable consequence of a target offense constituted implied malice. [FN 9] Instructions are not to be considered in isolation, but regarded in their entirety from the common sense perspective of the jury. (*Middleton v. McNeil* (2004) 541 U.S. 433, 437; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1320–1321.) Thus, the jury was instructed as Cruz–Santos desires. We therefore conclude that he has failed to "demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67–68; accord, *People v. Solomon* (2010) 49 Cal.4th 792, 822; *Boyde v. California* (1990) 494 U.S. 370, 380.)

> FN 9: "The defendant is charged in Count 1 with murder in violation of Penal Code Section 187. To prove that a defendant is guilty of this crime, the People must prove that (1) the defendant committed an act that caused the death of another and (2) when the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought: express malice and implied malice. [¶] Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice if he unlawfully intended to kill. The defendant acted with implied malice if (1) he intentionally committed an act; (2) the natural and probable consequences of the act were dangerous to human life; (3) at the time he acted, he knew his act was dangerous to human life; and (4) he deliberately acted with conscious disregard for human life."

**The Supplemental Argument**

As previously shown, the jury was instructed with CALCRIM No. 402 that "If the murder

was committed for any reason independent of the common plan to commit the target offense or offenses, then the commission of murder was not a natural and probable consequence of those offenses." In *Smith,* our Supreme Court determined that the gist of this sentence was error:

"This sentence, if correct, would mean that a nontarget offense, even if reasonably foreseeable, is not the natural and probable consequence of the target offense if the jury finds it was committed for a reason independent of the common plan to commit the target offense.... [¶] ... Both parties argue that the sentence does not correctly state the law. We agree. To establish aiding and abetting liability under the natural and probable consequence doctrine, the prosecution must prove the nontarget offense was reasonably foreseeable; it need not *additionally* prove the nontarget offense was not committed for a reason independent of the common plan to commit the target offense." (*Smith,* at pp. 613–614.)

In supplemental briefing (which Cruz–Santos joins), Zepeda–Onofre explains why he believes this error infected his trial: "[The trial] court instructed on a coconspirator's liability under the natural and probable consequences doctrine for unplanned offenses ... committed by another member of the conspiracy, but the court's instruction failed to include the directive that *Smith* found essential, that a coconspirator was *not* liable for an unplanned crime that was a fresh and independent product of the mind of another conspirator that fell outside the common design to illegally cultivate marijuana."

But the error identified in *Smith* is one that disadvantages the prosecution, not the defendant: "If the prosecution can prove the nontarget crime was a reasonably foreseeable consequence of the crime the defendant intentionally aided and abetted, it should not additionally have to prove the negative fact that the nontarget crime was not committed for a reason independent of the common plan." (*Smith,* at p. 617.) This was why the court concluded that "because the sentence was unduly favorable to defendant, giving it cannot have harmed him." (*Ibid.*)

The *Smith* court went on to consider "whether substantial evidence supports defendant's murder convictions under the natural and probable consequence doctrine.... [¶] Defendant contends the evidence was insufficient because the jury could not determine for sure who committed the two murders. The prosecution theory was that Littleton was the killer. But exactly who shot and killed the two victims was not entirely clear. There was evidence that both Littleton and Tovey possessed guns and fired shots. It was not certain which gun Littleton used and which gun Tovey used. But any such uncertainty did not matter as long as the jury unanimously agreed, as to each killing, that, whoever the actual gunman was, that gunman both committed murder, i.e., killed a human being with malice (Pen. Code, § 187), and was a principal in the target crimes. If the jury made those findings and also found that defendant aided and abetted the commission of the target crimes, and the murders were a natural and probable consequence of the target crimes, it could convict defendant of the murders despite uncertainty as to who exactly the killer was." (*Smith,* at p. 617.)

"'"[A]s long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. [Citations.] More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator.... [¶] ... [¶] Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. Sometimes ... the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other." [Citations.] Defendant contends that different facts would support aiding and

13

abetting liability and liability as a direct perpetrator, but, as we have explained, the jury need not unanimously agree "on the precise factual details of how a killing under one or the other theory occurred in order to convict defendant of first degree murder." [Citation.] Naturally, in order to return a guilty verdict, the jury must agree unanimously that each element of the charged crime has been proved, but the factors that establish aiding and abetting liability are not included as elements of the crime of murder. [Citation.]' [Citation.]"

"'The jury must agree on a "particular crime" [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and others believed her guilty of another.' [Citation.] In this case, this means that 'the jury must unanimously agree on guilt of a specific murder'—McCarthy' s murder in one count and Hunt's murder in another. [Citation.] But additional unanimity is not required. [Citation.] 'Once the discrete event is identified, for example, the killing of a particular human being, the theory each individual juror uses to conclude the defendant is criminally responsible need not be the same and, indeed, may be contradictory.' [Citation.] It suffices if the jury unanimously agrees that the prosecution has proven beyond a reasonable doubt every element necessary to establish guilt of a discrete crime. [¶] ... Although substantial evidence would support a verdict on that basis, we are not so sure that was the sole basis for the verdict given the uncertainty in the evidence and the trial court's instructions. The court instructed the jury that its 'verdict' on each count had to be unanimous, but it gave no other unanimity instruction. It is possible that one or more of the jurors were not entirely certain exactly who fired the fatal shots, but all were convinced beyond a reasonable doubt that, whoever he was, he acted with malice and thus committed murder."

"As we have explained, that finding, if combined with the other findings beyond a reasonable doubt necessary to convict—that whoever committed the murder was a principal in the target crimes, that defendant aided and abetted the target crimes, and that the murders were a natural and probable consequence of the target crimes—would mean each juror was convinced beyond a reasonable doubt that defendant was guilty of murder. No additional unanimity is required. The jury certainly had to find that someone committed murder. But the 'jury simply did not have to find' exactly who that person was. [Citation.] ..."

"Applying these rules here, the jury could readily have found as to each murder charge that the actual killer, whether he was Littleton or Tovey Moody or some other member of Pueblo Bishop, committed a discrete murder, i.e., that he killed McCarthy as to one count and Hunt as to another, and that he acted with malice regarding each killing. The jury could also have reasonably found that all of the possible shooters were aiders and abettors, and therefore principals, in the target offenses. Each juror could reasonably reject the possibility that some stranger to the jump out happened to come by at that moment and fired the fatal shots. The evidence also fully supported a finding that defendant aided and abetted the target offenses. Accordingly, the jury could reasonably find defendant guilty of the nontarget murders if they were the natural and probable consequence of the target offenses." (*Smith,* at pp. 618–619.)

These principles are not hard to apply here. Unlike *Smith,* this prosecution involved only one murder. On their verdicts for count one, the jury found Cruz–Santos and Zepeda–Onofre guilty of the second degree murder of Gabino. The verdicts do not identify who pulled the trigger: each verdict shows the jury's finding "Not True" the allegations that each defendant "personally and intentionally discharged a firearm which caused great bodily injury or death to Gabino Lopez–Santiago." But the verdicts also recorded the jury's findings that each defendant "personally used a firearm" and that "in the commission ... of the above offense [Gabino's murder], a principal in said offense was armed with a firearm, to wit: a Handgun." Thus, although the jury did not specify which defendant fired the fatal shots, the jury did conclude that both Cruz–Santos and Zepeda–

Onofre were principals in the murder. *Cruz-Santos*, 2015 WL 728204 at *5–*10.

### a. Standard

On habeas corpus review, the court's inquiry into the sufficiency of evidence is limited. Evidence is sufficient unless the charge was "so totally devoid of evidentiary support as to render [the petitioner's] conviction unconstitutional under the Due Process Clause of the Fourteenth Amendment." *Fish v. Cardwell*, 523 F.2d 976, 978 (9th Cir. 1975) (citations and quotations omitted). The standard of review on a sufficiency of the evidence claim has long been whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also Wright v. West*, 505 U.S. 277, 284 (1992); *Gonzalez v. Knowles*, 515 F.3d 1006, 1011 (9th Cir. 2008); *Schell v. Witek*, 218 F.3d 1017, 1023 (9th Cir. 2000) (en banc) (each discussing *Jackson* standard for sufficiency of evidence claims). The Court must respect the province of the trier of fact to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the trier of fact resolved all conflicts in a manner that supports the finding of guilt. *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997) (citation and quotations omitted); *see also United States v. Stanton*, 501 F.3d 1093, 1099 (9th Cir. 2007) (discussing deference owed to jury determinations).

On federal habeas review, relief may be afforded on a sufficiency of the evidence claim only if the state court's adjudication of such claim involved an unreasonable application of *Jackson* to the facts of the case. *Juan H. v. Allen*, 408 F.3d 1262, 1274–75 (9th Cir. 2005) (as amended). The California standard for determining the sufficiency of evidence to support a conviction is identical to the federal standard enunciated by the United States Supreme Court in *Jackson*. *People v. Johnson*, 26 Cal.3d 557, 576 (Cal. 1980). Sufficiency of the evidence claims are judged by the elements defined by state law. *Jackson*, 443 U.S. at 324.

### b. Analysis

In California, criminal conspiracy is an offense distinct from the actual commission of the

criminal offense that is the object of the conspiracy. *People v. Morante*, 20 Cal. 4th 403, 416–17. (Cal. 1999). A conspirator is criminally responsible for any act committed by any co-conspirator if that act "which follows incidentally in the execution of the common design as one of its probable and natural consequences." *Id.* at 417. All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, are principals in any crime so committed. Cal. Penal Code § 31.

Murder is defined as the unlawful killing of a human being with malice aforethought. Cal. Penal Code § 187(a). Malice may be either express of implied. Express malice exists when there is a deliberate intention to unlawfully take away the life of a fellow creature. Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. Cal. Penal Code § 188. In distinguishing murder from manslaughter, which does not require malice, the California Supreme Court has explained that

> malice is implied . . . when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

*People v. Cook*, 39 Cal. 4th 566, 596 (Cal. 2006).

In California, a defendant may be found guilty under an aiding and abetting theory if the following elements are established beyond a reasonable doubt: (1) the defendant acted with knowledge of the unlawful purpose of the perpetrator; (2) the defendant acted with the intent or purpose of committing, encouraging, or facilitating the commission of the offense; and (3) the defendant, by act or advice, aided, promoted, encouraged or instigated, the commission of the crime. *See People v. Prettyman*, 14 Cal. 4th 248, 259 (Cal. 1996) (citing *People v. Beeman*, 35 Cal. 3d 547, 561 (Cal. 1984)). "Once the necessary mental state is established, the aider and abettor is guilty not only of the intended, or target, offense, but also of any other crime the direct perpetrator actually commits that is a natural and probable consequence of the target offense." *People v. Mendoza*, 18 Cal. 4th 1114, 1123 (Cal. 1998).

The California Supreme Court described the natural and probable consequence (or NPC) doctrine as follows:

16

A consequence that is reasonably foreseeable is a natural and probable consequence under this doctrine. A nontarget offense is a '"natural and probable consequence"' of the target offense if, judged objectively, the additional offense was reasonably foreseeable. The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. Rather, liability is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted. Reasonable foreseeability is a factual issue to be resolved by the jury.

*People v. Smith*, 60 Cal. 4th 603, 611 (Cal. 2014)

On habeas review, the court cannot reevaluate the evidence, and must draw all inferences in favor of the verdict. *Jackson*, 443 U.S. at 319. The only question is whether a rational trier of fact could have found beyond a reasonable doubt that Gabino's killing was a natural and probable consequence of the target crime of marijuana cultivation which Petitioner aided and abetted. *Id.* After carefully reviewing the record, the Court concludes that the state court's rejection of this claim was not based on an unreasonable determination of the facts. The evidence presented at trial could support a finding that gun violence, including murder, was a natural and probable consequence of the marijuana cultivation that Petitioner participated in. The state appellate court noted that workers at the marijuana garden regularly carried firearms with the expectation that they might be needed and were expected to be used. When Ramon started working at the marijuana farm, Petitioner directed Augustin to give Ramon a gun and instructed Ramon to use the gun in case of emergency, i.e. if intruders tried to steal the marijuana or if wild animals entered the garden at night. Reporter's Transcript ("RT")[6] 1819–22, 1842, 2107–08, 2134. Petitioner and Augustin were often armed when at the garden, RT 1852–58, and Petitioner instructed others to use firearms to resolve disputes or scare away intruders (and he was seen using firearms in that manner, including on the day of the killing), RT 1895–97, 1901–05, 1918–19, 2011–12, 2014. Viewing the evidence in the light most favorable to the verdict as required, the Court concludes that there was sufficient evidence from which a rational trier of fact could find beyond a reasonable doubt that Gabino's murder was a natural and probable consequence of Petitioner's unlawful cultivation of marijuana. Under the deferential habeas standard of review, this Court cannot find that the state appellate court's conclusion that Gabino's murder was a reasonably

---

[6] The Reporter's Transcript has been filed as Exhibit 3 to the Answer.

foreseeable consequence, as that term is defined under California law, of the cultivation of marijuana to be based on an unreasonable construction of the evidence under the facts of this case, or contrary to, or an objectively unreasonable application of, federal law.  *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).  Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 2.        Failure to Corroborate Accomplice Testimony

Petitioner argues that the accomplice testimony was not sufficiently corroborated to sustain his conviction.  Pet. at 15–16.  The state court rejected Petitioner's claim as follows:

**Lopez–Velasco as Accomplice**

Cruz–Santos contends that error on several levels attended the admission of Lopez–Velasco's testimony. Cruz–Santos first argues that the evidence demonstrated, as a matter of law, that Lopez–Velasco was an accomplice of both defendants. Thus, the trial court erred in not instructing the jury with CALCRIM No. 335 to that effect, but rather allowing the question of whether Lopez–Velasco was an accomplice to be decided by the jury as an issue of fact (CALCRIM No. 334). Proceeding from the premise that Lopez–Velasco was an accomplice, Cruz–Santos then submits that his testimony lacks sufficient corroboration.

"Section 1111 prohibits a defendant from being convicted on the uncorroborated testimony of an accomplice. Accomplice testimony must be corroborated by 'other evidence as shall tend to connect the defendant with the commission of the offense.... [¶] An accomplice is ... defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' [Citation.] In other words, '[t]o be so chargeable, the witness must be a principal under [Penal Code] section 31. That section defines principals as "[a]ll persons concerned in the commission of a crime, whether ... they directly commit the act constituting the offense, or aid and abet in its commission...." [Citation.] An aider and abettor is one who acts with both knowledge of the perpetrator's criminal purpose and the intent of encouraging or facilitating commission of the offense. Like a conspirator, an aider and abettor is guilty not only of the offense he intended to encourage or facilitate, but also of any reasonably foreseeable offense committed by the perpetrator he aids and abets.' [Citation.]"

"Unless there can be no dispute concerning the evidence or the inferences to be drawn from the evidence, whether a witness is an accomplice is a question for the jury. On the other hand, the court should instruct the jury that a witness is an accomplice as a matter of law when the facts establishing the witness's status as an accomplice are '"clear and undisputed."'" [Citations.]" (*People v. Williams* (2008) 43 Cal.4th 584, 635–636.)

Although the prosecution was willing to concede that Lopez–Velasco was an accomplice to the cultivation charge, Cruz–Santos errs in extrapolating that "*[i]pso facto,* he was an accomplice" in all the other offenses except those where he was named as the victim. The fact that Lopez–Velasco had once been charged with participation in the murder does not label him as an accomplice as a matter of law for all time. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 432 ["the fact that Tannis was initially charged in the case is not dispositive"].) The language of *People v. Richardson* (2008) 43 Cal.4th 959, 1024 is particularly apt: "While it is true ... that Marshall was at one point charged with [the] murder, it is also true that after he told police defendant had confessed to him, the

charges were dropped. On this record then, it cannot be said that the evidence that Marshall was an accomplice ... was undisputed either in terms of the facts or the inferences to be drawn therefrom."

In his opening brief, Cruz–Santos states his case why Ramon Lopez–Velasco was an accomplice as follows: "Ramon was the only witness who testified that Sidonio was conspiring and working with other people—namely, Augustin [Zepeda–Onofre], Conrado, and Ramon—to cultivate marijuana. Ramon was the only witness who testified that Sidonio hired others to work on the marijuana garden. Ramon was the only witness who testified that Sidonio possessed firearms. [¶] Ramon was the only witness who testified that Sidonio was present at the gathering on Saturday evening, drinking beer, and celebrating the marijuana harvest. Ramon was the only witness who claimed Sidonio became angry at Conrado and Gabino. Ramon was the only witness who claimed Sidonio had a handgun after the shooting. Ramon was the only witness who claimed Sidonio grabbed Conrado by the shirt and the neck, while holding a handgun, and ordered Conrado not to tell anyone what he saw. Ramon was the only witness who claimed Sidonio said, after the shooting, that Gabino had 'gone to hell,' 'just because I want to.' Ramon was the only witness who claimed Sidonio told him and Conrado to carry the body away. [¶] Without Ramon's testimony, the prosecution had no case against Sidonio for murder, conspiracy to cultivate marijuana, ADW upon Gabino, or ADW upon Conrado."

But Cruz–Santos undercuts his argument by conceding "Some factual details of Ramon's testimony were corroborated by other sources. For example, he eventually told the police where he dumped Gabino's body. The victim's blood was found where Ramon told them to look. The marijuana garden was located as Ramon described.... [W]hile some of these details may have corroborated Ramon's testimony where and when the homicide occurred, none of it corroborated Ramon's claim that Sidonio was personally involved." Knowing where the victim's body would be found corroborates Lopez–Velasco's testimony as to how it came to be there—because he put it there, at defendants' order, very shortly after he saw defendants moving towards where the victim was last seen alive. The same is true for Lopez–Velasco knowing where the victim's blood could be found on the driveway of the garden property.

"The court's task was not to determine whether the jury *could* reasonably find [the witness] was an accomplice, but rather whether it could *only* reasonably find that he was an accomplice." (*People v. Bryant, Smith and Wheeler, supra,* 60 Cal.4th 335, 430, some original italics omitted.) The trial court performed that task without error.

The requisite quantum of corroboration may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offenses. Certainly the prosecution need not present corroboration of every aspect and detail of the witness's testimony. "Only a portion of the accomplice's testimony need be corroborated...." (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 25.) "The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.'" (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) "[E]vidence of corroboration ... is sufficient if it connects defendant with the crime, although such evidence 'is slight and entitled, when standing by itself, to but little consideration.'" (*People v. Holford* (1965) 63 Cal.2d 74, 82.) Thus, even if Lopez–Velasco did as a matter of law qualify as an accomplice, the failure to so instruct the jury would be harmless because his testimony, as noted above, had ample corroboration. (*People v. Manibusan* (2013) 58 Cal.4th 40, 95; *People v. Whalen* (2013) 56 Cal.4th 1, 60.)

*Cruz-Santos*, 2015 WL 728204 at *10–*13.

### a.    Analysis

19

After carefully reviewing the record, the Court concludes that the state court's rejection of this claim did not involve an unreasonable application of clearly established federal law. Petitioner's argument that Ramon's testimony was not sufficiently corroborated relies on his presumption that the trial court erred in failing to find and instruct that Ramon was an accomplice as a matter of law. However, whether Ramon was an accomplice as a matter of law is a question of California law. Even if the trial court erred in finding that Ramon was not an accomplice as a matter of state law, any such state law error does not state a ground for federal habeas relief. *Estelle*, 502 U.S. at 67–68. Similarly, the requirement under section 1111 of the California Penal Code that "a conviction cannot be had upon the testimony of an accomplice unless it be corroborated" is a matter of state law, which does not implicate a federal constitutional right. *See Redding v. Minnesota*, 881 F.2d 575, 578 (8th Cir. 1989). In fact, no such corroboration requirement exists in a federal criminal prosecution. *See United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993); *see also United States v. Lopez*, 803 F.2d 969, 973 (9th Cir. 1986) ("The uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face."); *Sabari v. United States*, 333 F.2d 1019, 1020 (9th Cir. 1964) ("the uncorroborated testimony of an accomplice, if believed by the jury, is sufficient to support a jury verdict."). Nor was the state court's decision based on an unreasonable determination of the facts. As the state appellate court noted, Ramon's testimony was corroborated in part by the evidence. Gabino's body and blood were where Ramon said they would be. RT 1933–36, 1949, 1954, 2000–04. Petitioner is not entitled to federal habeas relief on this claim.

### 3. Instructional Error

Petitioner argues that the trial court committed instructional error when it failed to instruct the jury as to the correct required mental state for the crime of witness intimidation. Pet. at 16. The state court rejected Petitioner's claim as follows:

**Witness Intimidation Instructions**

Section 136.1, subdivision (a)(1) penalizes a person who "[k]nowingly and maliciously" prevents, dissuades, or attempts to prevent or dissuade, "any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law."

United States District Court
Northern District of California

Subdivision (c)(1) elevates any of these acts to a felony when "accompanied by force or by an express or implied threat of force or violence." Cruz–Santos was convicted of violating section 136.1, subdivision (c)(1). He makes a number of claims as to why this conviction must be overturned.

The jury was instructed with CALCRIM No. 252 that this was a general intent offense. Cruz–Santos contends this was error. "The crime of attempting to dissuade a witness from testifying is a specific intent crime. [Citation.] 'Unless the defendant's acts or statements are intended to affect or influence a potential witness's or victim's testimony or acts, no crime has been committed....'" (*People v. Wahidi* (2013) 222 Cal.App.4th 802, 806.) Because this was misinstruction on an element of the offense, Cruz–Santos correctly identifies this as error of federal constitutional magnitude. (*Neder v. U.S.* (1999) 527 U.S. 1, 15; *People v. Gonzalez* (2012) 54 Cal.4th 643, 662–663.) This error has been held harmless in instances where the defendant's statements or acts are not ambiguous, but clearly convey an explicit warning. (*People v. Jones* (1998) 67 Cal.App.4th 724, 727–728; *People v. Brenner* (1992) 5 Cal.App.4th 335, 339–340.) Virtually at the same moment Cruz–Santos was ordering Lopez–Velasco to dispose of the victim's body, while tapping Lopez–Velasco on chest with a gun, he was also telling Lopez–Velasco "if I said something or if I whispered something, that he was going to find me here or in Mexico and my family to do the same to me." There was no ambiguity here. Cruz–Santos was threatening Lopez–Velasco—talk and you will die. Your family will die. Here or in Mexico. We also note that the jury was also instructed that conviction required the prosecution to prove that Cruz–Santos "*knew* he was trying to prevent or discourage Ramon Lopez–Velasco from making a report to law enforcement and *intended* to do so." (Italics added.) [FN 10] In these circumstances the error was harmless. (*Chapman v. State of California* (1967) 386 U.S. 18, 24.)

> FN 10: As relevant here, the jury was instructed with CALCRIM No. 2622 as follows: "The defendant Sidonio Cruz–Santos is charged only in Count 2 with intimidating a witness in violation of Penal Code Section 136.1. To prove that the defendant is guilty of this crime, the People must prove that (1) the defendant maliciously tried to prevent or dissuade Ramon Lopez–Velasco from making a report to any law enforcement officer that someone else was a victim of a crime or the defendant maliciously tried to prevent or discourage Ramon Lopez–Velasco from causing or seeking the arrest of someone in connection with a crime, (2) Ramon Lopez–Velasco was a witness, and (3) the defendant knew he was trying to prevent or discourage Ramon Lopez–Velasco from making a report to law enforcement and intended to do so. [¶] A person acts maliciously when he ... intends to interfere in any way with the orderly administration of justice."

Cruz–Santos contends this omission was aggravated when the jury was instructed that it could not consider evidence that he was intoxicated in deciding whether he was guilty of violating section 136.1. [FN 11] Because the jury was allowed to consider voluntary intoxication as affecting other charges, the trial court must have accepted Lopez–Velasco's testimony on this point as substantial evidence, and thus, it was error not to extend recognition of the principle to the intimidation count. (*See People v. Mendoza* (1998) 18 Cal.4th 1114, 1134.) However, this was state law error. (*See People v. Pearson* (2012) 53 Cal.4th 306, 325; *People v. Letner* (2010) 50 Cal.4th 99, 186–187.) The jury did not think Cruz–Santos sufficiently impaired to acquit him of murder, nor to reject liability as an aider and abettor, which were identified in CALCRIM No. 252 as requiring specific intent, a concept reiterated in CALCRIM Nos. 401 and 520. Moreover, as previously mentioned, the jury was told that convicting Cruz–Santos of intimidation required that he acted maliciously, that is, intentionally. (*See* fn. 10 and accompanying text, *ante*.) Thus, the omission can be deemed harmless because "'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the

jury's consideration since it has been resolved in another context...." (*People v. Wright* (2006) 40 Cal.4th 81, 98.)

> FN 11: The jury was instructed with CALCRIM No. 625 as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation or the defendant acted with a specific intent required for aiding and abetting or for conspiracy. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect. [¶] You many not consider evidence of voluntary intoxication for any other purpose. Do not consider evidence of intoxication in deciding whether murder is a natural and probable consequence of the named target offenses."

Although Cruz–Santos doesn't expressly say it, logically he is arguing that the jury should have been instructed with CALCRIM No. 3426 (jury may consider voluntary intoxication in determining whether the defendant acted with the specific intent or mental state required for conviction).

*Cruz-Santos*, 2015 WL 728204 at *10–*11.

### a.    Standard

Challenges to jury instructions generally do not state a federal constitutional claim. *See Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983); *see also Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985). With regard to an erroneous instruction that is a misstatement of law, the Supreme Court has held that "the fact that an instruction was allegedly incorrect under state law is not a basis for [federal] habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991). A federal court's inquiry on habeas review is not whether a challenged jury instruction "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). "In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). However, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Id.* The pertinent question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (internal quotation marks omitted) (quoting *Cupp*, 414 U.S. at 147).

### b.    Analysis

After carefully reviewing the record, the Court concludes that the state court's decision that the misinstruction as to the intent required for witness intimidation constituted harmless error did not involve an unreasonable application of clearly established federal law, and that the state court's decision was not based on an unreasonable determination of the facts.

The Court views the jury instructions as a whole. In the jury instructions identifying which crimes require general intent and which crimes require specific intent, the trial court incorrectly identified witness intimidation as a general intent crime. RT 4858–60. However, the specific instruction on witness intimidation correctly stated that the jury had to find that Petitioner acted with specific intent to convict him of that offense.[7] RT 4885–86. In relevant part, the witness intimidation instruction required that the jury find that Petitioner acted "maliciously," which the instruction defined as "intend[ing] to interfere in any way with the orderly administration of justice." RT 4485. In addition, evidence was presented supporting a finding of specific intent. Ramon testified that as he was being ordered to dispose of the body, Petitioner threatened to kill Ramon and his family if Ramon spoke about the killing. RT 1925–26, 3994. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

### 4.     Failure to Allow Third Party Culpability Evidence

Petitioner alleges that the trial court violated his due process rights when it prohibited Petitioner from presenting evidence of third-party culpability. Pet. at 16. The state court rejected Petitioner's claim as follows:

> **Third Party Culpability**
> Quoting the caption of his brief, Cruz–Santos submits that "the trial court erred in excluding evidence that Conrado lied to the police in claiming that Gabino was home and

---

[7] The witness intimidation instruction stated:
> To prove that the defendant is guilty of this crime, the People must prove that (1) the defendant maliciously tried to prevent or dissuade Ramon Lopez-Velasco from making a report to any law enforcement officer that someone else was a victim of a crime or the defendant maliciously tried to prevent or discourage Ramon from causing or seeking the arrest of someone in connection with a crime, (2) Ramon Lopez-Velasco was a witness, and (3) the defendant *knew* he was trying to prevent or discourage Ramon Lopez-Velasco from making a report to law enforcement and intended to do so.
>
> A person acts maliciously when he . . . *intends* to interfere in any way with the orderly administration of justice.

RT 4885–86 (emphasis added).

asleep, and in claiming a false alibi; and the trial court erred in barring the defense from arguing that those lies, plus Conrado's flight to Mexico, showed Conrado's consciousness of guilt." He elaborates: "When Conrado was arrested by police at 3:00 a.m., he told several lies. He denied any knowledge of the homicide. He falsely told the police that Gabino was home and asleep. He falsely told the police his truck was parked outside his house. He gave himself a false alibi, by telling the police that he came home at 6:25 p.m. [¶] The trial court excluded Conrado's statements, even though defense counsel established that they were not hearsay, because he sought to admit them for their falsity, rather than for their truth. The trial court also barred [Cruz–Santos] from arguing to the jury that Conrado's flight to Mexico showed consciousness of guilt." Thus, this "evidence of third party culpability should have been admitted," and the trial court's ruling violated Cruz–Santos's due process rights under the state and federal constitutions to present a defense.

The modern authority for permitting a defendant to introduce evidence that another person committed the crime traces to *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*). As our Supreme Court summarized: "'"[T]he standard for admitting evidence of third party culpability [is] the same as for other exculpatory evidence: the evidence [has] to be relevant under Evidence Code section 350, and its probative value [cannot] be "substantially outweighed by the risk of undue delay, prejudice, or confusion" under Evidence Code section 352.' " (*People v. Kaurish* (1990) 52 Cal.3d 648, 685, citing *Hall* at p. 834.) "'To be admissible, the third-party evidence need not show "substantial proof of a probability" that the third party committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability.... [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' (*People v. Hall, supra,* 41 Cal.3d at p. 833.)" (*People v. Hamilton* (2009) 45 Cal.4th 863, 914.)

As for Cruz–Santos's due process arguments, *Hall* itself recognized: "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain ... a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. [Citations.] ... [T]his principle applies perforce to evidence of third-party culpability.... [¶] ... [N]ot one [authority] suggests that third-party culpability evidence must be admitted no matter how remotely relevant and without considering its potential to disrupt orderly proceedings." (*Hall,* at pp. 834–835.) "[C]ourts should simply treat third-party culpability evidence like any other evidence" (*id.* at p. 834), and if excluded under Evidence Code section 352, "a trial court's broad latitude in this respect will not be upset on appeal absent a showing of abuse of discretion." (*People v. Robinson* (2005) 37 Cal.4th 592, 626.)

Our Supreme Court still adheres to that view. (E.g., *People v. Lucas* (2014) 60 Cal.4th 153, 270; *People v. Edwards* (2013) 57 Cal.4th 658, 729; *People v. McWhorter* (2009) 47 Cal.4th 318, 368.) And so also does the United States Supreme Court: "While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." (*Holmes v. South Carolina* (2006) 547 U.S. 319, 326.)

One could ascertain from Cruz–Santos's brief that the trial court's ruling came after extensive arguments that occupy more than 30 pages of reporter's transcript. The court deliberated overnight, and then stated its ruling, which deserves quotation at length:

"[T]here's a lot of factual underpinnings to this ruling that ... weigh very heavily in the 352 process .... 352 is always a guiding principle and not wasting the jury's time sending them off, all the parties off in different avenues that may unduly consume time. But in this matter, the Court is more concerned about misleading the jury, confusing the jury, and prejudice that may result to all parties. So that's really what my focus is in considering [Cruz–Santos's] request to have some additional information put before the jury regarding Conrado's false statements, as well as evidence regarding his being absent from this trial.

"Now, so I want to just very carefully ... go through some of the things that were important to the Court in going through its 352 analysis. [¶] ... [¶]

"... Ramon circumstantially placed Sidonio and Augustin as firing shots at Gabino. All the statements and circumstances, evidence have Sidonio, Augustin, and Ramon as armed and protecting the marijuana garden. Conrado has Sidonio and Augustin as firing and at Gabino. There is some confusion, certainly.... There is a certain lack of clarity, but the Court isn't convinced that there was an unknown additional person identified by Conrado because of the confusion in the names. It's apparent in the statement.

"Both Conrado and Ramon ... have Sidonio in charge. It's clear by the evidence so far that that's the situation. Augustin was identified as a gunman and labored in the marijuana garden, just as Ramon becomes a worker and co-participant in this conspiracy to cultivate and protect the marijuana garden.

"I've already mentioned that there is some evidence in the record that Sidonio became angry with the arguing that was going on while they were drinking and using cocaine, not only an issue of who was better as a comparison of people, but also on the issue of Gabino maybe making statements about Conrado's cocaine use to others.

"In the context of this case, the Court puts a lot of emphasis on that as being a motivating matter. At least the drug ... and alcohol use, that certainly would have clouded any decision process going on that night. Gabino was an outsider, more so than the others, and the threat of being or possibly disclosing this cocaine use to others.

"Now, trying to admit the defense—trying to admit, somewhat picking and choosing, which statements should be excluded as hearsay and which ones should be admitted is for nonhearsay purposes. Certainly, the Court does believe that Conrado made false statements initially, just as Ramon did.

"The issue of fleeing is somewhat speculative. If you look at this subjectively, we don't know where he and his family are. We don't know if something bad really did happen to them. And, certainly, we wouldn't want the jury to speculate about that with the evidence that's in the record of threats having been made on the scene the night of homicide.

"Certainly, any aspect of that would be highly prejudicial if it was emphasized in trial, whether he deliberately fled because of some kind of issue of culpability or because of fear for his life or because ... something awful has already happened to him, as he suspected and was fearful, at least as expressed early on to law enforcement, that he was very concerned about his family.

"So picking and choosing the issue of what hearsay statements come in for a nonhearsay purpose or the fleeing would be highly prejudicial and potentially highly prejudicial to all parties and, additionally, highly misleading if all the evidence didn't come in. And, certainly, the only way that all the evidence could come in is if Conrado was here to testify and [be] subject to the crucible of cross-examination, and direct, for that matter.

"It really is pure speculation that he fled because of fear of his immigration issues and now

25

intense law enforcement interest in him or culpability for the role he played in the conspiracy. And, certainly, the Court finds that he was very much engaged in this conspiracy. He provided labors. He was there in the cultivation of marijuana.

"Certainly, the stronger evidence is he fled out of fear of the case, meaning the fear of the defendants and any known or unknown associates. The fact that he fled because of culpability is a lesser issue.

"So to place evidence of his fleeing—and the defense is what's calling it fleeing. I know all parties have probably made significant attempts. Certainly, I have the exhibit that the defense gave me on the People's attempts to interview and meet with him and track him down. But fleeing is certainly a conclusionary statement. He's just—neither party has come up with him to place him before the jury; but it would be highly prejudicial, highly misleading if his other statements of fear weren't also admitted for a nonhearsay purpose.

"And, additionally, placing in the initial lies without also including the entirety of his statement to put that into context and how that evolved would be highly misleading. All of this would take time. It would divert the jury. It would allow both sides to argue speculation, all parties, without the witness actually being present. And that's the real danger of admitting hearsay statements.

"I don't believe there would be any possible limiting instruction that would diminish the prejudice or misleading nature of admitting some but not all of the hearsay statements.

"The Court also has seen nothing in the record, not any statement, whether admissible or otherwise, that places a gun in Conrado's hand. There's no direct or circumstantial evidence that Conrado was the shooter.

"Certainly, a jury could find, just as they could find, with Ramon, that he was a participant in the conspiracy to cultivate marijuana, as I stated previously. Both defendants and Ramon also could be found by the jury to equally be armed and in furtherance of that conspiracy, but not Conrado.

"So, in substance, the Court does find ... that this is really collateral evidence. It's insignificant as far as any direct or possible role that Conrado had, culpability beyond the cultivation in actually committing the murder. I think it would incur speculation. I think it would generate speculation by admitting some but not all the evidence. It would unduly consume time in giving all parties a pursuit of this highly speculative evidence. If—certainly, if he comes in and testifies—and I don't know if any efforts are still being made to find him—all this could be remedied. And, certainly, the Court's rulings would be far easier if we had him subject to cross-examination and direct.

"So, in the absence of anyone producing this witness, I do find under 352 that the probative value of what the defense asks to admit is far outweighed by its prejudice. I do find it's not just substantial prejudice, it's extreme prejudice, to put it in the way the defense has advocated for.

"Further admissions, some admission of hearsay regarding false statements in the very initial stages of the investigation, whether—and we haven't focused on the wife, but certainly she hasn't been produced by any party, either, as a witness. And I don't have any factual backdrop. I'm assuming that all the efforts by law enforcement to focus on finding Conrado also included the spouse. But, in any case, those initial misleading statements, without further context of all statements, would be extremely misleading and extremely prejudicial....

"So I'm not really focusing on the additional delay or undue consumption of time, but

that's an element of all these extraneous matters. I just am ruling in favor of the People in this regard and prohibiting that evidence to come in. A lot of evidence is already in. You know, Conrado's been placed on the scene. He's been placed as a co-conspirator, to a certain extent. The motive, if any, that comes out of those arguments is before the jury. And anything that's before the jury may be properly argued by the parties as to their meaning, if any. But as far as putting in this additional evidence at this time, the Court excludes it."

Conspicuously absent from Cruz–Santos's brief is any real or systematic attempt to dismantle or refute the court's reasoning.

It is certainly a gross exaggeration to claim the trial court's ruling left Cruz–Santos helpless before the jury. "[T]he trial court merely rejected some evidence concerning a defense, and did not preclude defendant from presenting a defense...." (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) The ruling did not prevent him from attacking the credibility of Lopez–Velasco hammer and tongs, and the lack of corroboration for his version. [FN 12] And the ruling did not prevent counsel from drawing the jury's attention to other evidence that Lopez–Velasco made false statements to police, and that those statements had significant discrepancies in them. Zepeda–Onofre's counsel was, if anything, even more slashing. [FN 13] The trial court's ruling did not categorically foreclose the defense arguing that Conrado was not an innocent, but was actually involved in Gabino's death. Nor should it be forgotten that counsel's efforts apparently persuaded the jury not to convict Cruz–Santos of first degree murder. In short, "the trial court merely rejected some evidence concerning a defense, and did not preclude defendant from presenting a defense...." (*People v. McNeal, supra,* at p. 1203.) No abuse of discretion is shown here.

FN 12: In his closing argument, Cruz–Santos's attorney asked the jury to see this as "a one witness case, a witness that is bought and paid for by the prosecution, and will testify to anything. And you've heard him testify about anything, and in the end, I submit you cannot believe him. And his testimony, even if you didn't find him to be an accomplice ..., it is just not worthy of belief that Sidonio committed these crimes. And when you look at it through the eyes of accomplice testimony, that needs corroboration before you can find anyone guilty on only that evidence, then there is really doubly no evidence against Sidonio Cruz–Santos." "Is there any corroboration for any of the statements? Is there any physical evidence in this case connecting Sidonio Cruz–Santos to the crime? There is nothing. Is there any gunshot residue on him? Is there anything suggesting that he did this? No. There is nothing. There is no physical evidence of any type that connects him to the offense or to the story that Ramon is giving you." "I introduced into evidence ... the shirt of Ramon. This is Ramon's shirt. This is the shirt with no blood on it. This is the shirt he says he was wearing.... So if Ramon's story is to be believed, how does a person who grabs a body, who doesn't go home to change, grabs the body, holds the body on two occasions and doesn't get any blood on his sleeves?"

FN 13: "Ramon ... is central to this case. Can't get away from it. [The] People can't avoid it. He's the one who sees or hears.... That's the bed Ramon has made for himself in this case. [¶] Now the lies are obvious.... And he didn't just lie, ... he made up dialogue, it was like script writing.... He becomes the hero.... [T]here is the lie.... [T]hat lie is toxic. That lie is an indication that this man who sat in front of seasoned detectives and told it several times, he's good. And I don't mean good in a good way. He lied so well these detectives bought it.... I will go over some of the credibility instructions ... instruction [CALCRIM No.] 226, witnesses. Man this list is like Ramon written all over it." "[T]his guy lies about stuff ... there is no point in lying about." "[T]his area is apparently pitch black. Right, that night it is pitch black. It is foggy I think people were saying. Nobody had flashlights, had a

lantern. This wasn't like a campsite, ... yet Ramon the all knowing sees everything...."

*Cruz-Santos*, 2015 WL 728204 at *13–*16.

### a. Standard

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision, or by depriving the defendant of the fair trial guaranteed by due process. *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir. 1991). "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (alteration in original) (quotation marks omitted); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (due process does not guarantee a defendant the right to present all relevant evidence). But this latitude is limited by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. *Holmes*, 547 U.S. at 324. While the Constitution thus protects defendants, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 326–27. Due process is violated only where the excluded evidence had "persuasive assurances of trustworthiness" and was "critical" to the defense. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). "Only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013). Violation of the right to present a defense merits habeas relief only if the error was likely to have had a substantial and injurious effect on the verdict. *See Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) (citing *Brecht*, 507 U.S. at 637–38).

Evidence of potential third-party culpability must be admitted when, under the "facts and circumstances" of the individual case, its exclusion would deprive the defendant of a fair trial. *Chambers*, 410 U.S. at 303 (exclusion of evidence of third-party confession violated due process where excluded evidence was highly corroborated and evidence was crucial to defense); *Lunbery*, 605 F.3d at 761 (exclusion of statement by third party that he had killed defendant's husband

deprived defendant of right to present a defense because "excluded testimony . . . bore substantial guarantees of trustworthiness and was critical to [defendant's] defense"). The Supreme Court has noted that "rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged . . . are widely accepted[.]" *Holmes*, 547 U.S. at 327. Moreover, the Ninth Circuit has determined that where the proffered evidence of third-party culpability simply affords a possible ground of suspicion pointing to a third party and does not directly connect that person with the actual commission of the offense, that evidence may be excluded. *People of Territory of Guam v. Ignacio*, 10 F.3d 608, 615 (9th Cir. 1993) (citing *Perry v. Rushen*, 713 F.2d 1447, 1449 (9th Cir. 1983)).

### b. Analysis

Petitioner fails to establish that the exclusion of Conrado's initial statements to the police and of Conrado's flight to Mexico under section 352 of the California Evidence Code violated due process. In general, the Supreme Court has required the admission of evidence of potential third-party culpability where the evidence shows that someone else committed the crime. For example, in *Chambers*, the Supreme Court found that the trial court improperly excluded testimony from three persons who each would have testified to hearing confessions made by McDonald that he, not Chambers, had shot the victim. *Chambers*, 410 U.S. at 292–94 and 302–03. Here, although consciousness of guilt can be inferred from the excluded evidence, this evidence does not directly link Conrado to the commission of Gabino's killing. Moreover, when viewed in context with all the proffered evidence related to Coronado, the excluded evidence also supports an inference that Petitioner or his co-conspirator Zepeda-Onofre killed Gabino, and that Conrado feared Petitioner and Zepeda-Onofre as a result. There was no evidence that Conrado was armed the evening of the killing; Petitioner testified that Conrado was not armed the evening of the killing; and a few days after the killing, Conrado told his former employer that he would move out of the country if the sheriff's department could not protect Conrado and his family from Petitioner and his friends. RT 321–27, 960–64, 990–95, 998, 102, 1190–97. The state appellate court's decision did not involve an unreasonable application of clearly established federal law. *Cf. Perry*, 713 F.3d at 1452–55 (exclusion of defendant's proffered evidence of third-party culpability did not violate Sixth and

Fourteenth Amendments where evidence was sufficiently collateral and lacking in probity on issue of identity and state had significant interest in avoiding unsupported jury speculation). Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

### 5.    Cumulative Prejudice

Petitioner alleges cumulative prejudice from the errors listed above. Pet. at 17–18. In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). For the reasons discussed above, the Court has found no constitutional error exists. Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).

## C.    Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, *id.* at § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

United States District Court
Northern District of California

## IV. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated:  8/10/2018

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge